**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03764-CMA-KLM

GERALD MAESTAS,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,

      Defendant.

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

      Pursuant to F.R.C.P. 56 and CMA Civ. Practice Standard 7.1E, Defendant moves the Court to enter summary judgment on the claims asserted in Plaintiff's Complaint and Jury Demand.

**I.**
**INTRODUCTION**

      The Court should grant summary judgment because Plaintiff is not a victim of discrimination or retaliation. Instead, the undisputed facts show Plaintiff was fired from his position as an accountant supervisor with the Denver Police Department because he, in fact, was the person making inappropriate comments towards his coworkers and subordinates. After a co-worker alleged he had sexually harassed her, the City conducted a thorough investigation which revealed many instances of sexually inappropriate conduct and statements Plaintiff made toward many employees. To avoid termination, Plaintiff deflected blame and made allegations against a subordinate that the City also investigated, but Defendant could not corroborate. Because Plaintiff was the perpetrator, and not a victim, of sexual harassment and of creating a hostile work environment, he was fired and summary judgment is appropriate on all of Plaintiff's claims.

**II.**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

    A.    <u>Investigation of Stephanie Johnson's Allegations and Basis for Plaintiff's Termination.</u>

1.    Plaintiff began working for the City on February 13, 2006, as a Senior Accountant, and his position was reclassified as a supervisor in 2016. (Movant's Appx., p. 4, Plf. Dep. at 5:16-7:2).

2.    Throughout his employment, Plaintiff's supervisor was Jeannie Springer, DPD Finance Manager. (Movant's Appx., p. 56, Springer Decl., ₱1).  When Ms. Springer was out of the office, Plaintiff was acting Finance Manager. *Id*.

3.    On March 3, 2016, Stephanie Johnson began working for the City as a Grant Administrator, reporting directly to Ms. Springer. (Movant's Appx., p. 60, Johnson Dec., ₱1).

4.    Plaintiff supervised Aaron Blaszczyk, Eric Barela, Jonathan Newcomb, Jo Ellen Meyer and Derek Cary. (Movant's Appx., p. 5, Plf. Dep. at 6:10-7:2).  He did not supervise Ms. Johnson except when he served as acting Finance Manager when Ms. Springer was out of the office. (Movant's Appx., p. 56, Springer Dec., ₱1).

5.    On October 25, 2018, Ms. Springer met with Ms. Johnson to discuss Plaintiff's allegations that Ms. Johnson was sharing employee salary information and was putting her feet on Plaintiff's desk.  (Movant's Appx., p. 60, Johnson Dec., ₱3). Ms. Johnson responded by raising concerns about inappropriate conduct by Plaintiff. *Id*.

6.    On October 31, 2018, Ms. Johnson provided Ms. Springer a document alleging that Plaintiff engaged in the following conduct:

    Said Ms. Johnson had "big booty denial/BBD," called her "pumpkinhead," accusing her of having "incestual" family members; compared her life to a book

called Flowers in the Attic involving an incestual family; claimed he wanted to hire an interview candidate because she had "big tits," and that Ms. Johnson's "tits" were not big;  described his ideal woman as having "big tits" and a small waist; said that "women belong in the kitchen" and "it's a scary time for men" because women falsely report sexual assault; he has sex with women but will not allow them to stay overnight; asked Ms. Johnson, after she had dyed her hair, whether "the carpet matched the curtains," a reference to her pubic hair; questioned a friendship with a male colleague, Aaron Blazcyzk, telling people she wanted to be "Mrs. Blazcyzk;" talks negatively about co-workers behind their backs; initiated a conversation about women peeing after sex and accused Mr. Blaszcyz of being gay because he was not aware of this practice; stated that Mr. Blaszcyz and colleague Darek Cary were gay because they had cats; asked Ms. Johnson if she knew about "dinosaur erotica" and showed her several online sites referencing it. (Movant's Appx., p. 60, Johnson Decl., ¶4; p. 65-66, Johnson Memo).

7.     Ms. Springer contacted Human Resource Manager Allison Hamel that night. (Movant's Appx., p. 57, Springer Dec., ¶5). The next day, Plaintiff was placed on paid investigatory leave.  (Movant's Appx., p. 45, Plf. Dep. at 126:3-4.)

8.     Ms. Hamel and Employee Relations Specialist Becky Lambert began their investigation by interviewing Ms. Johnson, as well as Plaintiff's subordinates Jo Ellen Meyer, Aaron Blaszczyk, Derek Cary, Holly Boyd, and Eric Barela[1]. (Movant's Appx., p. 67, Hamel Decl., ¶3; pp. 70-71, Lambert Decl., ¶¶ 3,6).

9.     All these employees reported to the investigators that they heard Plaintiff make the following comments:

a.     Blaszczyk and Cary were gay because they had cats and/or did not wear socks and shared a hotel room on a work trip (Movant's Appx., p. 62, Johnson Decl. at ¶ 19; p. 72, Barela Decl. at ¶ 4; p. 75, Blaszczyk Decl. at ¶ 4; p. 79, Boyd Decl. at ¶3; p. 83, Cary Decl. at ¶ 9-10; p. 87, Meyer Decl. at ¶ 7);

b.     People with shiny shoes were gay (Movant's Appx., p. 62, Johnson Decl. at ¶ 26; p. 72, Barela Decl. at ¶ 4; p. 75, Blaszczyk Decl. at ¶ 4);

---

[1] Plaintiff's supervisor, Jeannie Springer, was also interviewed. She denied hearing any of the inappropriate comments alleged by any of the witnesses. (Movant's Appx., p. 57, Springer Dec., ¶6)

c.      Johnson had "BBD" or "big butt denial" (Movant's Appx., p. 61, Johnson Decl. at ¶ 6; p. 76,  Blaszczyk Decl. at ¶ 6; p. 79, Boyd Decl. at ¶ 3; p. 86, Meyer Decl. at ¶ 7; p. 82, Cary Decl. at ¶ 6);

d.      Plaintiff's ideal woman had large breasts and a tiny waist and that women belong in the kitchen, cleaning and cooking (Movant's Appx., p. 61, Johnson Decl. at ¶7; p. 76, Blaszczyk Decl. at ¶ 10; p. 79, Boyd Dec. at ¶5, p. 83, Cary Decl. at ¶11; p. 87, Meyer Decl. at ¶ 8-9);

e.      Women who don't work out every day should not wear leggings because they have "craters" (Movant's Appx., p. 61, Johnson Decl. at ¶ 10; p. 76, Blaszczyk Decl. at ¶ 6; p. 79, Boyd Decl. at ¶ 5);

f.      The "Me Too" movement is a scary time for men because women falsely accuse men of sexual assault; talked about having sex with women and leaving their homes (Movant's Appx., p. 61, Johnson Decl. at ¶ 7 and 13, p. 76, Blaszczyk Decl. at ¶¶ 11 and 12; p. 83, Cary Decl. at ¶¶ 11 and 14);

g.      Plaintiff called Johnson "pumpkinhead," implying her family was incestual, a reference to the book Flowers in the Attic (Movant's Appx., p. 61, Johnson Decl. at ¶8; p.76,  Blaszczyk Decl. at ¶ 7; p. 79, Boyd Dec. at ¶6;  p. 83, Cary Decl. at ¶8);

h.      Plaintiff called Johnson "Mrs. Blaszczyk" and referred to her and Blaszczyk as "lovebirds" or "co-horts" and implied she and Blaszczyk were having sex and teased them about it (Movant's Appx., p. 61, Johnson Decl. at ¶ 11; p. 72-73, Barela Decl. at ¶ 5; p. 75-76, Blaszczyk Decl. at ¶ 5; p. 83, Cary Decl. at ¶ 12);

i.      Plaintiff suggested Meyer was a lesbian (Movant's Appx., p. 61, Johnson Decl. at ¶ 12; p. 76, Blaszczyk Decl. at ¶ 13; p. 83, Cary Decl. at ¶ 13);

j.      Plaintiff saw Johnson dyed her hair and asked if the "carpet matched the drapes," (Movant's Appx., p. 61, Johnson Decl. at ¶ 14; p. 76, Blaszczyk Decl. at ¶9);

k.      Plaintiff discussed women urinating after sex and accused Blaszczyk of being a virgin because for being unaware of that fact (Movant's Appx., p. 62, Johnson Decl. at ¶ 18);

l.      Plaintiff talked about dinosaur erotica and pulled up pictures of it on the internet (Movant's Appx., p. 62, Johnson Decl. at ¶ 20);

m.     Plaintiff talked about hating the Crime Lab, deliberately interfering with its work, and ignoring calls (Movant's Appx., p. 62, Johnson Decl. at ¶17; p. 73, Barela Decl. at ¶ 8; p. 80, Boyd Decl. at ¶ 9; p. 87,Meyer Decl. at ¶ 13);

n.      Plaintiff told Cary's colleagues that Cary was not doing a good job and he was docking Cary's performance review for poor performance Attic (Movant's Appx., p. 62, Johnson Decl. at ¶16; p. 76, Blaszczyk Decl. at ¶ 14; p. 79, Boyd Dec. at ¶6; pp. 83-84, Cary Decl. at ¶16; p. 73, Barela Decl. at ¶9; p. 87, Meyer Decl. at ¶ 12);

o.      Plaintiff encouraged Newcomb to have sex with older women for financial benefit (Movant's Appx., p. 62, Johnson Decl. at ¶ 17; p. 73, Barela Decl. at ¶ 6);

p.      Plaintiff discussed working for a store that sold child porn and "furry parties" where people dress as animals and have sex (Movant's Appx., p. 73, Barela Decl. at ¶ 7);

q.      Plaintiff talked about 80s TV shows, calling them "jiggle or booby vision" depicting women's' breasts (Movant's Appx., p. 76, Blaszczyk Decl. at ¶ 10);

4

r.      Plaintiff placed a lollipop between the legs of a teddy bear on Boyd's desk to give it a penis (Movant's Appx., p. 80, Boyd Dec. at ₱7);

s.      Plaintiff called Meyer stupid to her face (Movant's Appx., p. 87, Meyer Decl. at ₱ 10); and

t.      Plaintiff favored Newcomb and gave him a more flexible schedule than other employees (Movant's Appx., p. 73, Barela Decl. at ₱ 6; p. 84, Cary Decl. at ₱ 17).

10.     Plaintiff's subordinate Jonathan Newcomb told the investigators the following facts: Plaintiff called Ms. Johnson "BBD" and said she had a big butt; Plaintiff called Ms. Johnson a "pumpkinhead," referencing a book about incest; said he liked big-breasted women and discussed having sex with them and leaving afterward. (Movant's Appx., p. 89-116, Newcomb Trans. at lines 346-376, 436-492, 656-663, 967-971).

11.     Plaintiff admitted during his December 4, 2018 interview to making the following statements: Mr. Cary was gay because he did not wear socks; he (Plaintiff) preferred women with big breasts; he had sex with women and left their homes without staying the night. Plaintiff also conceded that he talked about "jiggle TV" featuring women bouncing up and down. He also admitted discussing "pumpkinheads" with Ms. Johnson, implying she is a product of incest in reference to a book called Flowers in the Attic. Finally, he conceded telling Johnson about dinosaur erotica and showing her pictures of it on the internet. (Movant's Appx., p. 117-182, Plf's 12-4-18 Interview Trans. at lines 834-853, 1298-1310, 1341-1356,1519-1538, 1683-1753, 1891-1903).

12.     During this interview, Plaintiff alleged that Johnson engaged in inappropriate conduct such as putting sticky notes on her breasts, asking him how her butt looked, pulling up her dress, calling him gay, saying she hated gay men, and drawing a picture of her boyfriend's penis. He claimed he told Ms. Springer about the "gay" comments but she did not want to hear his other concerns. (*Id*. at lines 970-1000, 929-937, 970-971, 834-836, 1040 -1058, 2052-2065, 1062-1090).

13.     Ms. Hamel and Ms. Lamber investigated these allegations, re-interviewing Mr. Blaszczyk, Ms. Springer, and Ms. Johnson[2].  (Movant's Appx., p. 70, Lambert Dec., ⁋4).  Mr. Blaszczyk agreed that Ms. Johnson once drew a picture of a penis, but denied that the picture was of her boyfriend's penis. He said that she drew the penis because it came up that she did not know what an uncircumcised penis looks like. (Movant's Appx., p. 77, Blaszczyk Dec., ⁋19). None of Plaintiff's other allegations were corroborated. (Movant's Appx., p. 70, Lambert Dec., ⁋5).

14.     On December 19, 2018, Ms. Hamel issued a memo to DPD Division Chief Ron Saunier summarizing the investigation and concluding that Maestas violated relevant EEO policies. (Movant's Appx., p. 67, Hamel Dec., ⁋4; p. 188-191, 12/19/18 Memorandum).

15.     On December 31, 2018, Plaintiff was served with a Contemplation of Discipline letter. (Movant's Appx., p. 192-197, Contemplation of Discipline Letter). He attended a predisciplinary hearing on January 9, 2019. (Movant's Appx., p. 43, Plf. Dep. at 122:7-12). He provided a memo at that time. (*Id.* at p. 46-47, Plf. Dep. at 131:23-132:4; pp. 198-205, 1/9/19 Memorandum).

16.     Of note, in that meeting, Plaintiff admitted to the "shiny shoes" comment and to suggesting Newcomb date an older woman for financial gain. He alleged for the first time that Johnson called him a "Mexican" and a "bean counter," and that he told Ms. Springer "on multiple occasions" about Johnson's conduct. (Movant's Appx., pp. 198-205, 1/9/19 Memorandum).  He also stated that he did not complain to Human Resources prior to his predisciplinary hearing about

---

[2] Johnson was re-interviewed as the alleged harasser, and Mr. Blaszczyk because Plaintiff claimed that he and Mr. Newcomb witnessed some of Johnson's conduct. Mr. Newcomb was not re-interviewed because he was on Family and Medical Leave Act leave and then resigned. *See* (Movant's Appx., p. 186, Newcomb Dep. at 12:12-18).

Ms. Johnson because he was "afraid it was going to create a whole investigation." (Movant's Appx., pp. 206-237, Predisciplinary Trans. at lines 1219-1236).

17. Plaintiff was terminated on January 24, 2019, for making inappropriate sexual references and other offensive comments, and for inappropriately discussing employee performance and creating conflict in the Crime Lab. (Movant's Appx., pp. 238-242, Termination Letter). Chief Saunier made the decision to terminate Plaintiff based on the information gathered during the investigation and Plaintiff's statements made at the pre-disciplinary hearing. The specific reasons for termination are included in the termination letter dated January 24, 2019. (Movant's Appx., pp. 243-244, Saunier Decl. ¶5; p. 238-242, Termination Letter).

    B.    <u>Allegations Plaintiff Made **After** the Decision to Terminate Him (In Deposition).</u>

18. Prior to his deposition, Plaintiff always denied being homosexual. (Movant's Appx., pp. 117-182, 12/4/18 Transcript, lines 1040 and 1060). In fact, he expressed hostility towards homosexuals, telling Ms. Johnson that he refused to attend his niece's wedding to a woman because he did not approve of homosexuality. (Movant's Appx., p. 63, Johnson Decl. ¶28.) Plaintiff claimed for the first time in his deposition that he is homosexual, then stated he identifies as "asexual," meaning, he does not wish to have sex or be in a relationship with anyone. (Movant's Appx., pp. 19 and 54-55, Plf. Dep. at 34:6-13;194:15-195:4).

19. Plaintiff also claimed that in Spring 2017[3], Johnson started calling him a "Mexican," and a "bean counter" every day. (*Id.* at pp. 11-13, lines 16:3-18:22), but then clarified

---

[3] *But see* Plaintiff's December 4, 2018 interview transcript, Movant's Appx., p. 160, L. 1977-1984, "I have never had any issues with any inappropriate comments **until just recently** and it's all coming from Stephanie."

that "it was very sporadic. It wasn't very often. It was once in a great while and it got worse in the end." (*Id.* at pp. 42-43, lines 104:22–106:8). He was not offended when Newcombe called him a Mexican. (*Id.* at pp. 7-13, Plf. Dep. at 12:16-18:25). Per Plaintiff, the only employee who heard Ms. Johnson's comments was Newcomb. (*Id.* at pp. 13-14, Plf. Dep at 18:23-19:23). He did not report them to Ms. Springer because he believes she is racist. (*Id.* at p. 18, Plf. Dep. at 24:6-11).

20.     Plaintiff claimed that in Spring 2017, Johnson began calling him gay nearly every day. (*Id.* at pp. 20-22, Plf. Dep. at 36:8-38:11), and that in Fall 2018, she put her feet on his chair wearing see through underwear and he could see her vagina. (*Id.* at p. 23, Plf. Dep. at 40:1-18).

21.     Plaintiff claimed that two or three times in Fall 2018, Johnson put sticky labels or Post-Its on her breasts, and that she once pulled down her blouse.  Plaintiff claimed that Newcomb observed her putting sticky labels or Post-Its on her breasts, but not pulling down her blouse. (*Id.* at pp. 23-38, Plf. Dep. at 40:15-45:10).

22.     Plaintiff claimed in his deposition that he tried to talk to Ms. Springer in Spring 2018 about Ms. Johnson referring to Ms. Meyer as a lesbian but admitted that he did not tell her about any other comments Ms. Johnson allegedly made. (*Id.* at p. 30, Plf. Dep. at 77:16-:3).

23.     Plaintiff also claimed that in August or September 2018, he tried to talk to Ms. Springer about a conversation between him, Mr. Blaszczyk, and Ms. Johnson, about women peeing after sex, and Mr. Blaszczyk saying that he was "like a turtle" when his attractive female doctor had him remove his boxers. Plaintiff claimed that Ms. Springer said she didn't want to hear it. (*Id.* at p. 29 and 34-35; Plf. Dep. at 48:2-12; 81:4-82:13).

24.     Plaintiff next tried to talk to Ms. Springer a few weeks before his termination "about Stephanie's behavior." (*Id.* at pp. 35-37, Plf. Dep. at 82:14-84:9). He never sent her an email with

his concerns. (*Id.* at pp. 38-39, Plf. Dep. at 91:25-92:16). Plaintiff never went to Human Resources or another supervisor. After that conversation in mid-October, Johnson did not engage in any discriminatory conduct toward him. (*Id.* at p. 44, Plf. Dep. at 125:6-14).

25.     Plaintiff admitted in his deposition that while at work he discussed previously working at a store that sold child pornography and to telling Ms. Johnson she wanted to be "Mrs. Blaszczyk." (*Id.* at pp. 50, and 47-49; Plf. Dep. at 181:1-4; 132:22-134:6).

C.     Relevant City and County of Denver Policies That Existed in 2018.

26.     The City of Denver Career Service Rules apply to all civilian employees in the Denver Police Department and contain an EEO Policy which states:

> If an employee is subject to discriminatory, harassing, or retaliatory behavior from a co-worker, another city employee not in the employee's chain of command, or an individual the employee encounters while performing their duties who is not employed by the City, the employee is strongly encouraged to:
>
> i.     Make it clear to that person the behavior is offensive or makes the employee uncomfortable and ask that individual to stop; if the inappropriate behavior happens again, the employee must report the behavior to a supervisor and/or human resource representative, or both; or
> ii.    Report the behavior to a supervisor, a human resource representative, or through any mechanism set up by the City for reporting such complaints, or all of the above; or
>
> If the individual alleged to have committed the discriminatory, harassing, or retaliatory behavior is a City employee,
>
> iii.   Request mediation by conducting OHR; or
> iv.    File a grievance by completing the OHR grievance form and delivering the grievance form to the appointing authority or an HR representative of the employee's department or agency, unless the adverse employment action is subject to appeal.
>
> (Movant's Appx., pp. 246-253, CSA Rule 16, p. 16-5).

27.     The Department of Safety also has an EEO policy, which provides:

Individuals who believe they are subjected to prohibited discrimination, harassment, hostile work environment, and/or retaliation, if comfortable, are encouraged to tell the offending employee that such behavior is offensive and should be discontinued. If the individual does not feel comfortable and/or the offensive conduct continues, the individual should report the behavior to one of the individuals identified in A-D of this paragraph, below, immediately. All Department of Safety employees are required to promptly report potential violations of this policy so that appropriate actions may be taken. Potential violations should be reported to any of the following:

    a.    Any supervisor in the reporting employee's or offending employee's agency or work unit, inside or outside the chain of command;

    b.    The Internal Affairs Bureau for the reporting employee's or offending employee's agency (available twenty-four hours a day, seven days per week);

    c.    The Safety Employee Relations Specialist, and/or;

    d.    The Department of Safety, Human Resource Division.

(Movant's Appx., pp. 254-263, EEO Policy at p. 254).

28.    The Policy further provides:

Supervisors and managers who become aware, by any formal or informal means, of possible discrimination, harassment, or retaliation must take prompt, reasonable actions to stop the prohibited behavior. Additionally, supervisors and managers must promptly report any information concerning the possible prohibited behavior to Safety Employee Relations Specialist and their agency head, unless the agency head is the subject of the complaint. If the agency head is the subject of the complaint, employees, supervisors, or managers must report the complaint directly to the Employee Relations Specialist.

*Id.*

29.    The cover page of the Career Service Rules specifically disclaims any contractual relationship between the City and County of Denver and its employees. (Movant's Appx., p. 268, Career Service Rules cover page).

30.    Plaintiff filed an EEOC Charge on July 30, 2019. (Movant's Appx., p. 264-267, Plaintiff's EEOC Charge).

### III.
### PLAINTIFF'S FIRST CLAIM FOR RELIEF:

## <u>NATIONAL ORIGIN DISCRIMINATION (TITLE VII)</u>

A.      <u>Burden of Proof and Elements Which Must Be Proven</u>.

Plaintiff must prove: (1) he is a member of a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on national origin; (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of his employment and created an abusive working environment; and 5) Defendant had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir.2007) (alteration in original) (quoting *Dick v. Phone Directories Co*., 397 F.3d 1256, 1262 (10th Cir.2005)).

B.      <u>Plaintiff Cannot Prove Elements 4 or 5</u>.

1.      <u>Element 4: Severity or Pervasiveness</u>

The severity and pervasiveness of the alleged harassment should be viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22 (1993).  Factors to consider include the frequency and of the conduct; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367. Thus, the "plaintiff must show more than a few isolated incidents of racial enmity." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 286, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Bolden v. PRC Inc.,*43 F.3d 545, 551 (10th Cir.1994).

Plaintiff alleges that in Spring 2017, Johnson began calling him a "Mexican" and a "bean counter" "very sporadically, once in a great while, and it got worse in the end." SOF 19. However,

Plaintiff is not Mexican, and admits that it is not insulting to be called a "Mexican." *Id.  See Harsco*, *supra*, at 1187, citing *Harris, supra* (if the victim does not subjectively perceive the environment to be abusive, then the conduct has not altered the conditions of the victim's employment, and there is no Title VII violation).

Plaintiff also does not claim that these alleged comments were physically threatening or humiliating, or that they altered a term, condition, or privilege or employment. He claims that when Johnson bothered him in his office, he would address it by walking around the building or doing his work later. (Movant's Appx., pp. 53-54, Plf. Dep. at 227:12-228:8). However, he does not claim that he was required to work later because of Johnson's conduct; rather, he admitted he worked a later schedule because it was easier to work on grants. (*Id.* at pp. 15-16, Plf. Dep. at 20:19-21:17). He does not claim that he had to work overtime, was unable to complete his work, or that any other aspect of his employment was altered.

Further, although Plaintiff claims the harassment began in Spring 2017, he cannot recover for any conduct occurring before October 3, 2019, 300 days before his July 30, 2019 EEOC Charge. *Kahler v. Leggitt*, 2019 WL 3928622 (D. Colo. 2019) (J., Martinez). He agrees that Ms. Johnson did not engage in any harassing conduct after mid-October, and he was placed on leave on November 1, 2018.  SOF 7 and 25. Thus, the Court may only consider conduct that occurred between October 3, 2018, and mid-October, 2018. Several references to Plaintiff being a "Mexican" during that two-week period cannot rise to the level of hostile work environment.

2.    Actual or Constructive Knowledge, and Failure to Respond

Plaintiff cannot show that Defendant knew or should have known of the harassment and failed to adequately respond to it. To show actual knowledge, a plaintiff must show that he reported

harassment to management-level employees. *Ford v. West,* 222 F.3d 767, 775-776 (10th Cir. 2000). To prove constructive knowledge, a plaintiff must show that the acts of harassment are "so egregious, numerous and concentrated as to add up to a campaign of harassment." *Id.* at 776. The standard of proof for finding constructive knowledge under this element is higher than for the fourth element because it requires more than pervasiveness. *Id.*

Defendant failed to report the alleged discriminatory comments to anyone until his predisciplinary hearing on January 9, 2019 – long after Ms. Johnson had made her allegations against Plaintiff and he had been placed on administrative leave, and only when trying to convince Defendant not to discipline him. Defendant had policies in place that provided multiple avenues for reporting any alleged harassment and which required Plaintiff, as a supervisor, to do so. *See e.g. Mallinson-Montague v. Pocrnik*, 224 F.3d 1224, 1228 (10th Cir. 2000) (where harasser is supervisor, employer may avoid liability by providing affirmative defense that employee failed to take advantage of corrective polies and exercised reasonable care in preventing harassment)[4]. Yet Plaintiff did not take advantage of those opportunities to report the alleged harassment and because he failed to do so, Defendant cannot be held liable. *See Ford* at 776.

Plaintiff also admitted that no one but Mr. Newcomb (his subordinate) heard the alleged comments. (SOF 19). There is no evidence that the comments made between October 3, 2018 and mid-October 2018 were "so egregious, numerous and concentrated so as to add up to a campaign of harassment."[5] *See Ford, supra*, at 776. these complaints in his predisciplinary hearing on

---

[4] While Defendant does not bear this burden, Plaintiff's failure to take advantage of Defendant's policy further underscores that it was not negligent in preventing and correcting harassment.

[5] In fact, Plaintiff complains that Ms. Johnson allegedly harassed him by calling him a Mexican when he adamantly denies being Mexican, thereby harassing him not for who he was, but for who he wasn't. It would be akin to a white person referring to another white person as Black: foolish and incorrect, but not harassing the white person for who the person was or his actual protected class.

January 9, 2019, he was already on investigatory leave.  Because he was not in the workplace, he was not subject to the alleged discriminatory comments made by Ms. Johnson.  *See Adler v. Wal-Mart Stores, Inc.,* 144 F.3d at 676 (holding that where an employer takes action that was reasonably calculated to end the harassment, the response is reasonable). He cannot meet his burden to prove that Defendant's actions were unreasonable.

Moreover, Defendant did not have a duty to Plaintiff to take any additional actions after he reported Ms. Johnson's alleged comments on January 9, 2019.  By that point, Defendant had already learned from seven of Plaintiffs' colleagues that Plaintiff made inappropriate comments himself which violated Defendant's EEO policy and warranted his termination. Between January 9, 2019 and January 24, 2019, Plaintiff was still on investigatory leave and not in the workplace. Plaintiff was terminated on January 24, 2019. (SOF 17.) Because Defendant terminated Plaintiff for legitimate, nondiscriminatory reasons, *see Id.*, it owed no duty to Plaintiff to take steps to further investigate or "correct" the alleged harassment.

**IV.**
**PLAINTIFF'S SECOND CLAIM FOR RELIEF:**
**RETALIATION (TITLE VII)**

A.  Burden of Proof and Elements Which Must Be Proven.

In order to establish a prima facie case of retaliation, Plaintiff must show that "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1202 (10th Cir.2006).

B.     Plaintiff Cannot Prove Element 3 (Causal Connection).

14

A plaintiff may initially show that a causal connection existed if there was a temporal proximity between the protected activity and the materially adverse action. However, where an employer produces a legitimate, nondiscriminatory justification for taking the disputed employment action, the burden shifts back to the plaintiff to show that the employer's proffered reasons are a pretext for discrimination. *Stover v. Martinez,* 382 F.3d 1064, 1071 (10th Cir. 2004). To prove pretext, a plaintiff must show that the employer's proffered reason was so inconsistent, implausible, incoherent or contradictory that it is unworthy of belief. *Id.*

Defendant concedes temporal proximity. However, Defendant terminated Plaintiff for legitimate, nondiscriminatory reasons: because six coworkers (and to a lesser extent, a seventh, Mr. Newcomb) corroborated Ms. Johnson's complaints that he made offensive comments of a sexual nature over a period of years. SOF 9, 17. Prior to his termination, Plaintiff admitted to some of the comments. See SOF 7, 13 and 17. In his deposition, he admitted to more. SOF 27.

However, rather than apologize for his behavior, he attributed most of the offensive comments to Ms. Johnson and claimed that she was "retaliating" against him for reporting her comments about employee salaries. SOF 15. These allegations were investigated and uncorroborated.

The undisputed evidence shows that Chief Saunier terminated Defendant because he engaged in inappropriate, offensive conduct towards coworkers for which he took no responsibility, but instead deflected blame. SOF 17.

In determining whether Defendant has articulated a legitimate, nondiscriminatory motive, courts should "examine the facts as they appear to person making the decision." *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004). The Court does not judge whether the

employer's proffered reasons were "wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those belief." *Id*. at 924-925. "Evidence that the employer should not have made the termination decision – for example, that the employer was mistaken or used poor business judgment – is not sufficient to show that the employer's explanation is unworthy of credibility." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968 (10th Cir. 2017). Plaintiff may disagree with Defendant's decision to terminate him, but he has no evidence to refute Defendant's legitimate, non-discriminatory motive for doing so. Plaintiff also cannot meet his burden to prove that Defendant's decision was so inconsistent, implausible, incoherent or contradictory that it is unworthy of belief and therefore pretextual. *Stover,* 382 F. 3d at 1071.

Because Plaintiff cannot establish a causal connection between his complaints and his termination, the Court should grant summary judgment on his retaliation complaint.

## V.
## PLAINTIFF'S THIRD CLAIM FOR RELIEF:
## <u>42 U.S.C. 1981</u>

A. <u>Burden of Proof and Elements Which Must Be Proven</u>.

To prevail on a 42 U.S.C. § 1981 claim, the Plaintiff has the burden to prove: (1) the existence of a contractual relationship, as well as all the other elements of a hostile work environment claim under Title VII, including that (2) he is a member of a protected group; (3) he was subject to unwelcome harassment; (4) the harassment was based on race;  (5) due to the its severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment, and (6) Defendant had actual or constructive knowledge of the hostile work environment but did not adequately respond to it. *Domino's Pizza v. McDonald*, 126 S.Ct. 1246, 1250 (2006); *Aramburu v. Boeing Co.,* 112 F.3d

1398, 1410 (10th Cir.1997);  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir.2007).

B.      Plaintiff cannot prove elements 1, 5, or 6.

Section 1981 prohibits discrimination on account of race in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

1.      No contractual relationship.

First, Plaintiff cannot demonstrate the existence of a contractual relationship with Defendant because he, like almost all City and County of Denver employees, was an at-will employee. Although the Tenth Circuit has not yet addressed whether or not an at-will employee has a contractual relationship with its employer under Colorado law,[6] this Court has addressed the issue a few times.  In *Hussein v. Regents of Univ. of Colo*., 2000WL2475292 (D.Colo. 2006)(J. Wantanabe), an at-will budget office employee claimed his employer terminated him because of his race.  The Court granted the employer's motion for summary judgment, explaining that Section 1981 offers relief when racial discrimination:

> . . . impairs an existing contractual relationship, so long as the Plaintiff has or would have rights under the existing or proposed contractual relationship. . .  [I]n other words, Plaintiff cannot state a claim under Section 1981unless he has (or would have) rights under the existing (or proposed) contract that he wishes to make and enforce. Therefore, Plaintiff must identify an impaired contractual relationship under which he had rights in order to pursue a claim under Section 1981.

*Id*. at *4-5.

 Similarly, in *Solis v. Circle Group, LLC,* 2017 WL 1246487 (D. Colo. 2017) (J. Jackson),

---

[6] In *Perry v. Woodward,* 199 F.3d 1126, 1133 (10th Cir. 1999), the Court held that under a specific New Mexico law, an at-will employee and an employer have a contractual relationship that could support a §1981 claim. This Court has held that the New Mexico law, and therefore the Tenth's Circuit holding in *Perry,* do not apply to a Colorado case because Colorado does not have an equivalent law. *See Solis v. Circle Group, LLC,* 2017 WL 1246487 (D. Colo. 2017) (J. Jackson) at *3.

this Court held that where there is no written or oral contract between an employer and employee, a plaintiff cannot sustain a Section 1981 claim.

In contrast, in *Ingila v. Dish Network, LLC*, 2015 WL 729390, *3 (D. Colo. 2015) (J. Krieger), the Court held that the at-will employment relationship is contractual and therefore may give rise to a Section 1981 claim. *Ingila,* relied on a Colorado Supreme Court case, *Lucht's Concrete Plumbing, Inc. v. Horner,* 255 P.3d 1058, 1061 (Colo. 2011), for the proposition that employment at-will is contractual in nature, "albeit a contract that either side may terminate at any time without notice or cause…" *Ingila,* 2015 WL 729390 at 3. However, the issue in *Lucht's* was whether a non-compete agreement created contractual rights. *Lucht's*, 255 P.3d at 1062-1063. The Court concluded that because the non-compete agreement was negotiable at any time it therefore was a contract and at-will employment in that scenario was, in fact, contractual. *Id.*

The facts in *Lucht's* are not present here. There was no non-compete agreement and Plaintiff was an at-will employee. The first page of the Career Service Rules that govern the employment of civilian Denver Police Department employees (and almost all City employees) emphasizes the nature of the employment relationship:

> **Important – Disclaimer:** *The Career Service Rules do not create or constitute any contractual rights between or among the City and County of Denver, the Career Service Board, the Office of Human Resources, and any employee or applicant for employment.* (Emphasis in original.)

(Movant's Appx., p. 268, CS Rules Cover Page).

Thus, the *Ingila* court's ruling does not apply here. This Court should instead adopt the same reasoning and conclusions reached by the *Hussein* and *Solis* courts, specifically that as an at-will employee, Plaintiff cannot satisfy the first element of a Section 1981 claim.

2.      Elements 5 and 6 Should Be Analyzed Using the Title VII Arguments, *supra*.

Regarding elements 5 (severity or pervasiveness) and 6 (actual or constructive knowledge), these are the same elements necessary to prove a Title VII claim.  Courts do not engage in separate analyses of these elements under Section 1981 than they do for the Title VII analyses because the same legal standards apply. *Soutunde v. Safeway, Inc.,* 716 Fed.Appx. 758, 761 (10th Cir. 2017).

Thus, Defendant respectfully requests that the Court consider and incorporate its evidence and arguments in Section III.B.1. and III.B.2, *supra,* to in support of summary judgment on Plaintiff's Section 1981 claim on element 5 (severity or pervasiveness) and element 6 (actual or constructive knowledge).  Because Plaintiff cannot prove elements 1, 5 or 6 of his Section 1981 claim, the Court should grant summary judgment.

**VI.**
**PLAINTIFF'S FOURTH CLAIM FOR RELIEF:**
**GENDER AND SEXUAL ORIENTATION (TITLE VII)**

A.      Burden of Proof and Elements Which Must Be Proven.

Plaintiff must prove: (1) he is a member of a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, it altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment; 5) the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to it. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (alteration and quotation omitted).

B.      Plaintiff Cannot Prove Elements 1, 2 or 5.

Plaintiff's Complaint alleges he was discriminated against because of his "perceived sexual orientation (homosexual) and gender."   Complaint and Jury Demand, ECF No. 1, ¶ 45.

1.      <u>Plaintiff Is Not a Member of A Protected Class.</u>

Before his deposition, Plaintiff denied being homosexual. SOF 18.  Then in his deposition, Plaintiff initially claimed that he was homosexual, and within minutes backtracked to state that he is, in fact, "asexual." SOF 18. "Asexuality" is not a protected class.

Plaintiff appears to assert that Ms. Johnson harassed him because she *perceived* him to be homosexual. While the Supreme Court recognized homosexuality and transgender as protected classes under Title VII in *Bostock v. Clayton*, 140 S.Ct 1731 (2020), it did not go so far as to find that "perceived" homosexuality or transgender status are protected. "Perceived" homosexuality is not a protected class.  Because asexuality and "perceived" homosexuality are not protected classes under Title VII, Plaintiff cannot prove this element and summary judgment should be granted.

2.      <u>Plaintiff Was Not Subjected to Unwelcome Harassment.</u>

Plaintiff cannot claim that the majority of the alleged conduct was unwelcome. He claims Ms. Johnson called him "gay" every day; however, he admits to calling Mr. Cary "gay" and perpetuating a stereotype that men who wear shiny shoes are "gay." He cannot claim that the very conduct in which he engaged was "unwelcome."

5.      <u>Defendant Had No Knowledge of Harassment or Failed to Adequately Respond.</u>

Plaintiff cannot show that Defendant knew or should have known of the harassment and failed to adequately respond to it.  Defendant hereby incorporates the same evidence and arguments made in Section III.B.2., supra.

**VII.**
**<u>CONCLUSION</u>**

For the foregoing reasons, Defendant respectfully requests that the Court enter summary judgment in its favor on all of Plaintiff's claims and dismiss this lawsuit.

KRISTIN GEORGE
JESSICA R. ALLEN
Assistant City Attorneys

*s/ Jessica Allen*
Denver City Attorney's Office
Employment and Labor Law Section
201 W. Colfax Ave., Dept. 1108
Denver, Colorado 80202
Telephone:  (720) 913-3125
Facsimile:  (720) 913-3182
E-mail: dlefiling.litigation@denvergov.org
            kristin.george@denvergov.org
            jessica.allen@denvergov.org
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 6, 2022, a true and correct copy of the foregoing Defendant's Motion for Summary Judgment was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Andrew T. Brake, Esq.
3615 South Tamarac Drive
Denver, CO 80237
atbrake@gmail.com

*s/ Renee Castruita*

Denver City Attorney's Office